UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FRANKLIN ASHLEY,                    )
                                    )
         Plaintiff,                 )
                                    )
    vs.                             )          Case No. 4:19-cv-00309-MTS
                                    )
WILLIAM MCKINNEY, et al.,           )
                                    )
         Defendants.                )

## MEMORANDUM AND ORDER

This matter is before the Court on several pending Motions: Plaintiff's Motion Requesting Appointment of Expert Witnesses, Doc. [32]; Defendants' Motion to Strike Plaintiff's Unauthorized Surreply in Opposition to Defendants' Motion for Summary Judgment, Doc. [77], coupled with Plaintiff's Motion to Deny that Motion to Strike, Doc. [78]; Plaintiff's Motion for Appointment of Counsel, Doc. [82]; Defendants Stephen Vossick and Sarah Skaggs's Motion for Summary Judgment, Doc. [52]; and, finally, Defendant Cindy Griffith's Motion for Summary Judgment, Doc. [56].  After laying out the factual background of the case, the Court will first address Plaintiff's Motion Requesting Appointment of Expert Witnesses and his Motion for Appointment of Counsel.  Because the competing Motions pertaining to Plaintiff's Surreply to Defendants' Motions for Summary Judgment are relevant to the scope of materials the Court will consider for summary judgment purposes, the Court will briefly address those Motions before finally turning its attention to the Motions for Summary Judgment.

## I.   BACKGROUND

As an initial matter, the Court must address which facts are before it for purposes of summary judgment.  Defendants, in support of their Motions for Summary Judgment, provided

Statements of Undisputed Material Fact ("SOFs") that made specific references to various attached exhibits.  *See* Docs. [54], [58], and [59].  Plaintiff, rather than filing separate responses to each summary judgment motion, filed a single response in opposition, and he did not file a response specifically directed to either of the SOFs.  *See* Doc. [70].  In his response, Plaintiff failed to properly controvert most of Defendants' statements of fact.[1]  Federal Rule of Civil Procedure 56(c)(1) requires that a party asserting that there is a genuine dispute of fact support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  The moving party's SOFs are deemed admitted if the opposing party does not controvert those facts with specific references to the record as required by Fed. R. Civ. P. 56(c)(1).  *Freeman v. Adams*, No. 1:12-cv-86-SNLJ, 2014 WL 1056760, at *5 n.4 (E.D. Mo. Mar. 19, 2014); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  Likewise, under the Local Rules of the District Court for the Eastern District of Missouri, all matters set forth in an SOF shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.  *See* L.R. 4.01(E).

While the Court acknowledges that Plaintiff is representing himself in this matter, he is not excused from complying with the procedural requirements of this case.  *See Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002) ("All civil litigants are required to follow applicable procedural rules."); *Lindstedt v. City of Granby*, 238 F.3d 933, 937 (8th Cir. 2000) (per curiam) ("A pro se litigant is bound by the litigation rules as is a lawyer . . . .");

---

[1] Plaintiff's Surreply to Defendants' Motions for Summary Judgment, Doc. [76], suffers from the same deficiencies.

*Silberstein v. Internal Revenue Serv.*, 16 F.3d 585, 860 (8th Cir. 1994) ("[L]ocal rules . . . are binding on the parties."). Where Plaintiff provided references in support of his own claims or to dispute Defendants' version of events, the Court will take the facts in the light most favorable to Plaintiff. *See Littrell v. City of Kansas City*, 459 F.3d 918, 921 (8th Cir. 2006). But any facts in either SOF not controverted with specific citations to the record are deemed admitted by Plaintiff. *See Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 991 (8th Cir. 2006) (concluding district court properly deemed facts admitted that the opposing party failed to controvert). With that in mind, the Court turns to the facts.

Defendant Sarah Skaggs is a Licensed Practical Nurse (LPN). Doc. [53] at 4. She worked at Potosi Correctional Center (PCC), where Plaintiff is incarcerated, from March 2014 to December 2018. *Id.* As an LPN, Skaggs is not authorized to dictate the course of a patient's medical treatment and cannot prescribe medications, provide dental treatment, order lab tests, order diagnostic tests, or submit requests for consultations by off-site specialists. *Id.* Defendant Stephen Vossick is a registered nurse (RN) who was employed at PCC from June 2014 to August 2018. *Id.* at 4. Similar to Skaggs, Vossick cannot dictate the course of a patient's medical treatment, prescribe medications, order lab or diagnostic testing, or order that a patient be transported to the emergency room unless a patient "presents with life-threatening objective symptoms." *Id.* at 4–5. Both Skaggs and Vossick defer to the medical judgment of higher-level medical providers to determine the proper treatment for a patient. *Id.*

Defendant Cindy Griffith was the warden at PCC at the time of the issues that form the basis of Plaintiff's claims, though she has since retired from that position. Doc. [58] ¶ 2. In her capacity as warden, Griffith was responsible for the administration of PCC and for all employees of the Missouri Department of Corrections; she was not, however, responsible for the employment

or retention of medical personnel, who were instead employed by Corizon, Inc.  Doc. [58-1] ¶¶ 2–3.  She was additionally responsible for reviewing offender grievances at PCC.  *Id.* ¶ 2.  Skaggs, Vossick, and Griffith are the only remaining Defendants in this case.

Plaintiff's claims against Skaggs and Griffith arise out of Plaintiff's treatment for a toothache at PCC.  The toothache issue first arose in May 2017.  Plaintiff submitted a Medical Services Request (MSR) on May 21, 2017, complaining of a toothache.  Doc. [53] at 5; Doc. [54] ¶ 6.  Nurse Connie Barton saw him the next day, and Plaintiff told Nurse Barton that the toothache had started a "'long time' ago" and that he experienced pain "off/on."  Doc. [54] ¶ 6.  On examination, Nurse Barton noted possible caries (cavities) to one of Plaintiff's teeth, but she did not note any redness or swelling.[2]  *Id.*  She provided him with Motrin and told him she would refer him to a provider.  *Id.*

Plaintiff again saw Nurse Barton on June 17, 2017, complaining of a possible dental abscess.  *Id.* ¶ 7.  He stated he was experiencing constant pain in his upper right back tooth, upper jaw, and ear.  *Id.*  Nurse Barton noted possible slight swelling of Plaintiff's gums near the toothache but did not observe any redness, foul odor, or drainage, nor did she note any swelling elsewhere.  *Id.*  She did notice that Plaintiff's tooth filling was black.  *Id.*  She provided Plaintiff with Tylenol and decided to schedule a follow-up appointment.  *Id.*  She also sent a request with documentation of the assessment to the dental department.  Doc. [54-2] at 11.

Defendant Skaggs then saw Plaintiff on June 20, 2017, again for complaints related to aching in his upper right back tooth as well as for constipation.  *Id.* ¶ 8.  Plaintiff stated "nothing ha[d] changed with his tooth" and that his tooth pain improved with a salt-water gargle.  Docs. [54-2] at 11; [54] ¶ 8.  Skaggs noted a hole in Plaintiff's top back right tooth, but she did not

---

[2] Plaintiff's medical records reflect that he specifically told Nurse Barton that he had not experienced either redness or swelling at that time.

observe any swelling, fractured teeth, oral bleeding or trauma, severe tissue damage, or signs of infection, including swollen gums, swollen jaw, or severe redness.  Doc. [54] ¶ 8.  Plaintiff did not report severe tooth pain, and Skaggs noted no signs of acute distress.  *Id.*  Skaggs offered Plaintiff Tylenol and salt to treat the toothache, but Plaintiff declined, stating he already had both.  *Id.*  For Plaintiff's constipation, Skaggs administered Docusate and Dulcolax.  *Id.*  Like Nurse Barton, Skaggs then sent a request to the dental department that included documentation of her assessment. *Id.*

Plaintiff asserts that he asked Skaggs for antibiotics, but Skaggs informed him only a doctor could give him antibiotics and said she would "put him in to see a doctor."  Doc. [70] at 3.  He contends, without support from any evidence in the record, that "she failed and/or refused to put [Plaintiff] in to see the doctor."  *Id.*  Skaggs explained in her declaration that it was her usual practice to review a patient's upcoming appointments when deciding whether to refer a patient to a higher-level provider.  Doc. [54] ¶ 9.  While Skaggs could not recall whether she reviewed Plaintiff's upcoming appointments, Plaintiff's medical records indicate that he saw Dr. William McKinney on June 21, 2017, the day after his appointment with Skaggs.  *Id.* ¶¶ 9–10.  That appointment was related to an MSR Plaintiff submitted in May 2017 for back and hip pain.  Doc. [54-2] at 7.  There is no indication in the medical record that Plaintiff raised any issues related to his toothache or that he requested antibiotics from Dr. McKinney.  *See id.* at 7–9; Doc. [54] ¶ 11. Nurse Skaggs was not involved in Plaintiff's dental treatment after June 20, 2017.  Doc. [54] ¶ 13.

Plaintiff had another appointment for his toothache with a nurse on July 7, 2017.  Docs. [58] ¶ 17; [54-2] at 14–15.  At that appointment, Plaintiff noted that the toothache "had been going on for about two months," and he was experiencing constant pain.  Doc. [54-2] at 14–15.  The nurse observed that the "upper back teeth ha[d] several areas of decay" and that there was swelling

5

in Plaintiff's upper gums on the right side of his mouth. *Id.* In addition to again sending a request with documentation of the assessment to the dental department, the nurse noted that Dr. Doyle, a dentist, would be at PCC on July 12, 2017 and that Plaintiff would be scheduled for an appointment with Dr. Doyle then. *Id.* at 15; Doc. [58] ¶ 19. But Plaintiff did not see Dr. Doyle July 12, 2017, because Dr. Doyle "did not [go] to PCC" that day. Docs. [58] ¶ 20; [58-2] at 20:15–16.

On July 14, 2017, Plaintiff fell in his cell and hit his head, causing a gash above his right eye. Doc. [58] ¶¶ 21–22. He declared a medical emergency and was seen by a nurse; an on-call doctor told the nurse to dress the wound, and Dr. McKinney sutured it in the morning. *Id.*; Doc. [59] at 40–42. Plaintiff claims he blacked out before falling and that the blackout was caused by a lack of sleep due to the pain from his toothache. Docs. [58] ¶ 22; [58-2] at (22:6–20); [59] at 42; [70] at 3. Plaintiff finally saw a dentist on July 17, 2017, and the dentist noted that Plaintiff needed a tooth extraction. Doc. [54] ¶ 12. Plaintiff requested, and was given, an antibiotic before the extraction, and the tooth was extracted July 28, 2017. Docs. [54] ¶ 12; [58] ¶ 23. On August 4, 2017, Plaintiff indicated at an appointment with a PCC nurse that his dental issues had been resolved. Docs. [58] ¶ 24; [59] at 51.

Plaintiff filed an informal resolution request (IRR) on July 21, 2017, complaining that the dental treatment detailed above violated his constitutional rights. *See* Doc. [58-3] at 12–15. Among his complaints in the IRR was that PCC did not have a dentist at the facility. Doc. [58] ¶ 27. The director of nursing denied Plaintiff's IRR on August 4, 2017, stating that Plaintiff's dental issues had been appropriately handled. Doc. [58-3] at 16. In response to that denial, Plaintiff filed an offender grievance, reiterating the claims he made in the IRR and noting that he had seen a dentist on July 17, 2017 who prescribed him antibiotics. Doc. [58-3] at 7–10. In a response to the grievance, Defendant Griffith, Dr. McKinney, and Nurse Diana Larkin, the health

services administrator, acknowledged that there was "a significant period of time" between Plaintiff's initial complaints of a toothache and when he was actually seen by a dentist. *Id.* at 11. The response indicated that PCC was without a dentist during the time Plaintiff was struggling with his toothache, but "attempts were made to schedule [Plaintiff] with a [d]entist from another [c]orrectional [c]enter." *Id.*  A cancellation from another center delayed an appointment with a dentist, according to the response, wherein Griffith, McKinney, and Larkin also insisted that Plaintiff was "among the first offenders to be seen by the [d]entist who eventually came . . . to PCC." *Id.*; *see also* Doc. [58] ¶ 33.  Finally, Ashley filed an inmate grievance appeal, which was denied by the Missouri Director of Dental Services on November 21, 2017, for largely the same reasons set out in the response to Plaintiff's original grievance. *See* Docs. [58-3] at 2–3; [58] ¶ 36.

Plaintiff's claims against Defendant Vossick arise out of Vossick's treatment of Plaintiff's complaints of chest pain on September 9, 2017.  That day, around 5:30 p.m., Plaintiff declared a medical emergency due to a burning feeling in his chest that began around 5:00 p.m. after he drank a cup of coffee.  Doc. [54] ¶ 15.  He was seen by Nurse Vossick, who recorded Plaintiff's pain level as a 7/10, though Plaintiff asserted in his deposition that he told Vossick it was "above a 10." *Compare* Doc. [54] ¶ 16, *with* Doc. [58-2] at (44:12–15).  Plaintiff stated that the pain did not radiate or worsen with exertion, he did not have diabetes or any known coronary artery diseases, he did not have a history of stroke or mini-stroke, he was not enrolled in chronic care for either hyperlipidemia or hypertension, and he was not on dialysis.  Doc. [54] ¶¶ 16–20.  He denied any family history of cardiac disease, smoking, nausea, vomiting, palpitations, or shortness of breath. *Id.* ¶¶ 17–18, 21.  He appeared sweaty but had normal pallor, turgor, and skin color, and Vossick noted that Plaintiff was alert and oriented and that his speech was clear. *Id.* ¶¶ 21, 24.  Plaintiff also had a normal heart rate, a blood pressure of 148/96, a pulse of 86, and a pulse oximeter reading

of 99.[3]  *Id.* ¶¶ 22–23.

Vossick believed that Plaintiff's chest pain was "epigastric in nature" and that his symptoms would improve with rest.  Doc. [54-3] ¶ 7.  He gave Plaintiff aspirin at 6:00 p.m. and retook his blood pressure around 6:10 p.m., which had lowered to 138/64 from the earlier reading of 148/96.  *Id.*  His pulse oximeter measurement remained 99.  *Id.*  Around 7:00 p.m., Vossick performed an electrocardiogram ("EKG") on Plaintiff after his symptoms did not subside.  Doc. [54] ¶ 31.  The EKG, according to Vossick, did not conclusively show a cardiac event, though Plaintiff testified that Vossick told him the EKG machine was "old and outdated" and was not working properly.  *See id.*; Doc. [58-2] at (46:19–47:8).  Either way, Vossick contacted Dr. John Williams, the on-call doctor, around 7:30 p.m. regarding Plaintiff's symptoms and EKG results. Doc. [54] ¶ 32.  Dr. Williams ordered Zantac, which Vossick administered to Plaintiff, as well as two troponin draws.[4]  *Id.* ¶ 33.  According to troponin-draw protocol at PCC, the provider should perform the first troponin draw and wait four hours before performing the second.  *Id.* ¶ 36.

Plaintiff's medical records reflect that Vossick conducted the first troponin draw around 8:15 p.m., which yielded a negative result around 8:30 p.m. (since receiving the results of the draw takes approximately fifteen minutes).  Docs. [54-2] at 35–36; [54-3] ¶ 7.  Vossick, in his declaration, stated that he told Plaintiff the second draw would be taken four hours after the first. Doc. [54] ¶ 39.  Though he does not recall when he actually left PCC the night of September 9, 2017, Vossick normally went off duty around 11:00 p.m.  In the time between the first troponin

---

[3] Defendants say Plaintiff's blood pressure was "slightly elevated" and that both his pulse and pulse oximeter measurements fell within the "normal" range.  *See* Doc. [54] ¶¶ 22–23.

[4] In a declaration provided by Defendants, Dr. Williams stated that the purpose of a troponin test is to "measure the level of certain proteins in the blood which are released when the heart has been damaged" and that, according to research, "troponin levels are commonly elevated between four to nine hours after injury to the heart."  Doc. [54-4] ¶ 12.

draw and when Vossick left the facility for the evening, he asserts that he twice reassured Plaintiff that he would receive a second troponin draw that would determine the course of his treatment. *Id.* ¶ 40–41.  Vossick believed that the next nurse on duty would complete the second troponin draw.  *Id.* ¶ 41.

Nurse Diana Larkin performed the second troponin test around 12:30 a.m. September 10, 2017.  *Id.* ¶ 44.  The test was positive, so Larkin notified Dr. Williams, who ordered Plaintiff be transported to an emergency room.  Plaintiff was transferred to Washington County Memorial Hospital around 1:40 a.m.  *Id.*  He received treatment at that hospital, including another EKG and troponin test, which suggested an acute myocardial infarction.  *Id.* ¶ 45.  He was then transferred to Mercy Hospital Jefferson, where he underwent a cardiac catheterization without complication. *Id.* ¶¶ 45–47.  He was discharged from Mercy on September 11, 2017, was admitted to the prison infirmary that same day, and was discharged from the infirmary two days later.  *Id.* ¶ 48.

Claiming violations under 42 U.S.C. § 1983, Plaintiff alleged that each of Skaggs, Vossick, and Griffith violated the Eighth Amendment's prohibition against cruel and unusual punishment because they were deliberately indifferent to his serious medical needs.  All three Defendants have moved for summary judgment.

## II.   MOTIONS FOR APPOINTMENT OF EXPERT WITNESSES AND COUNSEL

Plaintiff, invoking Federal Rule of Evidence 706, filed a Motion for Appointment of Expert Witnesses, Doc. [32], requesting that the Court appoint an independent neuropsychologist, orthopedist, and cardiologist to review his medical files and examine the injuries he alleges were caused by Defendants' deliberate indifference.  *See* Doc. [32] ¶¶ 3–5.  Under Fed. R. Evid. 706, the Court may "appoint an expert witness to testify in an action and order reasonable compensation be paid to the witness by the parties, in such proportion as the Court directs."  *Houston v. Corizon*

*Health Care*, No. 4:20-cv-00291-JAR, 2021 WL 168747, at *1 (E.D. Mo. Jan. 19, 2021).  Courts have wide discretion in determining whether a Rule 706 appointment is warranted.  *Id.*  Courts generally will not appoint an expert in the absence of compelling circumstances, since "[t]he appointment of experts under Rule 706 . . . should be reserved for exceptional cases in which the ordinary adversary process does not suffice."  *Malady v. Corizon*, No. 1:13-cv-80-SNLJ, 2013 WL 5835995, at *1 (E.D. Mo. Oct. 30, 2013); *see also Rachel v. Troutt*, 820 F.3d 390, 397 (10th Cir. 2016) ("Though [Rule 706] permits the district court to appoint a medical expert, courts rarely exercise this power."); *Toney v. Hakala*, 556 F. App'x 570, 571 (8th Cir. 2014) (emphasizing that courts should appoint an expert witness "only under compelling circumstances" (quoting *U.S. Marshals Serv. v. Means*, 741 F.2d 1053, 1059 (8th Cir. 1984) (en banc))).  Finally, the purpose of Rule 706 is "'to aid the Court,' and not for the benefit of one of the parties."  *Rueben v. United States*, No. 2:13-cv-33-DPM-JTK, 2014 WL 5460574, at *3 (E.D. Ark. Oct. 27, 2014) (citing *Hannah v. United States*, 523 F.3d 597, 600 (5th Cir. 2008)).

Considering the claims and record before the Court, this case does not present any compelling circumstances that justify the appointment of expert witnesses.  Plaintiff's claims of cruel and unusual punishment in violation of the Eighth Amendment are not complex; they present straightforward deliberate indifference claims arising out of Plaintiff's treatment for a toothache by Defendant Skaggs (and other PCC medical personnel) and for chest pain by Defendant Vossick.[5]  The deliberate indifference standard is both demanding and subjective, requiring that the plaintiff suffered from an "objectively serious medical need" *and* that the defendants "actually

---

[5] It is also not clear that each of the experts Plaintiff asks the Court to appoint would have any experience relevant to the claims still at issue in this case.  Because Plaintiff's claims arise out of treatment for a toothache and chest pain, it does not appear that a neuropsychologist or orthopedist would have any particular expertise pertaining to the seriousness of Plaintiff's condition when he was treated for his toothache or chest pain.

knew of but deliberately disregarded" that need. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). There is sufficient factual information in the record for the Court to make its own determination of the first requirement, and an expert would not aid the Court in resolving the second.[6] *See Trout*, 820 F.3d at 397–98 (noting that some courts limit expert appointments to "truly extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role" (quoting *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988))); *Ledford v. Sullivan*, 105 F.3d 354, 358–59 (7th Cir. 1997) (upholding denial of request for expert appointment where, "[g]iven the particular factual issues in th[e] case, determining deliberate indifference was not so complicated that an expert was required to establish" liability). For those reasons, the Court denies Plaintiff's request that it appoint expert witnesses.

Plaintiff also requests that the Court appoint him counsel. Doc. [82]. This is Plaintiff's second such request. *See* Doc. [31]. The Court denied the first, finding that, though Plaintiff has presented non-frivolous claims in this case, he had "demonstrated that he can adequately present his claims without an attorney." Doc. [33] at 1–2. As the Court previously explained, "[t]here is no constitutional or statutory right to appointed counsel in civil cases." *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006). Instead, where the moving party has pleaded a nonfrivolous cause of action, whether to appoint counsel falls within the discretion of the trial court. *See id.* In considering whether to appoint counsel, courts consider "the factual and legal complexity of the underlying issues, the existence of conflicting testimony, and the ability of the indigent plaintiff to investigate the facts and present his claims." *Ward v. Smith*, 721 F.3d 940,

---

[6] The Court does not mean to suggest that an expert could never be warranted in a deliberate indifference case by virtue of the standard; rather, the particular facts of this case, and the application of the standard to those facts, are sufficiently straightforward that use of an expert is unnecessary.

942 (8th Cir. 2013).

Because nothing has changed since Plaintiff's first request for appointment of counsel, the Court will deny the Motion. Plaintiff has continued to clearly articulate his claims and arguments, has successfully filed numerous motions, and this case does not involve factually or legally complex issues.

## III. MOTIONS RELATED TO PLAINTIFF'S SURREPLY TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants Vossick and Skaggs filed their Motion for Summary Judgment on May 12, 2020. Doc. [52]. Defendant Griffith filed her own Motion for Summary Judgment on May 13, 2020. Doc. [56]. Defendant filed a single response to both Motions for Summary Judgment, Doc. [70], and Defendants promptly filed their replies, Docs. [71] and [72]. Plaintiff then, without seeking leave of the Court, filed a "Supplemental Motion in Response to Defendant's [sic] Motion for Summary Judgment," Doc. [76]. Defendants Skaggs and Vossick moved to strike the "Supplemental Motion" as an improper surreply to Defendants' Motions for Summary Judgment, Doc. [77], and Plaintiff filed his own Motion to Deny Defendants' Motion to Strike, Doc. [78].

Local Rules 4.01(A)–(C) generally permit three briefs on a motion: a memorandum in support of the motion, a response in opposition to the motion, and a reply in support of the motion. L.R. 4.01(A)–(C). Any additional briefs may not be filed without the Court's leave. L.R. 4.01(C). In order to have the most complete picture of the facts for purposes of summary judgment, the Court will permit the filing of Plaintiff's Surreply even though Plaintiff did not seek permission before filing it. *See Johnson v. Neiman*, No. 4:09-cv-689-AGF, 2011 WL 830950, at *1 (E.D. Mo. Mar. 3, 2011). Defendants' Motion to Strike, Doc. [77], is therefore denied, and Plaintiff's Motion to Deny Defendants' Motion to Strike, Doc. [78], is granted only to the extent it asks the Court to

deny the Motion to Strike.[7]   However, to the extent that Plaintiff used his Surreply to recycle discovery arguments the Court already rejected in a prior Order, see Doc. [81], the Court will ignore those arguments.

## IV.   DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standards

#### 1. *Summary Judgment*

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if it finds "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if a reasonable jury could return a verdict for" the non-movant. *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1051 (8th Cir. 2012) (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009)).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations marks omitted).  The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

---

[7] In Plaintiff's Motion to Deny Defendants' Motion to Strike, Plaintiff also requested that "the Court grant a continuance of further proceedings under Rule 56(f)" to allow Plaintiff time to retain an expert opinion.  Doc. [78] at 5–6.  The Court denies this request for the same reasons it denied Plaintiff's Motion for Appointment of Expert Witnesses, discussed in Section II, *supra*, and also because discovery in this case has been closed for nearly a year. *See* Doc. [28] ¶ 4.

### 2. Deliberate Indifference

It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to the protection of prisoners from deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed. *Id.* at 104–05. To establish deliberate indifference to a serious medical need, a plaintiff must show that (1) he suffered from an "objectively serious medical need," and (2) that prison officials "actually knew of but deliberately disregarded" that need. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). A medical need is sufficiently serious if it has been diagnosed by a physician as requiring treatment or it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (citing *Vaughn v. Greene Cnty.*, 438 F.3d 845, 851 (8th Cir. 2006)). Negligence will not give rise to a claim for deliberate indifference in violation of the Eighth Amendment. *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

The deliberate indifference standard is extremely demanding—it requires a mental state "akin to criminal recklessness." *Jackson*, 756 F.3d at 1065 (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)). "Deliberate indifference is 'more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014) (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). To succeed on his claim, Plaintiff must show that Defendants' actions were "so inappropriate as to evidence intentional maltreatment or a

refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997). Thus, liability for deliberate indifference requires that a prison official be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Pietrafeso v. Lawrence Cnty., S.D.*, 452 F.3d 978, 982 (8th Cir. 2006) (quoting *Moore v. Briggs*, 381 F.3d 771, 773–74 (8th Cir. 2004)). The alleged failure to treat a medical condition does not rise to the level of a constitutional violation "unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Daniel v. Farmer* ex rel. *Collett*, No. 1:07-cv-00001-SNLJ, 2009 WL 3073713, at *6 (E.D. Mo. Sept. 22, 2009) (quoting *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997)).

When a claim of deliberate indifference is based on a delay in treatment, a plaintiff must introduce verifying medical evidence in the record establishing that the delay in medical treatment had a detrimental effect on the inmate's prognosis. *Coleman*, 114 F.3d at 784. Failure to provide such evidence precludes a claim of deliberate indifference to medical needs. *Id.* Moreover, an inmate alleging an Eighth Amendment violation for delay in treatment "must demonstrate that the delay was prompted by 'obduracy and [wantonness], not inadvertence or error in good faith." *Daniel*, 2009 WL 3073713, at *6 (quoting *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994)).

### B. Discussion

#### 1. *Defendant Skaggs*

Plaintiff alleges Defendant Skaggs was deliberately indifferent to his serious medical needs because she did not properly address his toothache and failed to refer him to a physician. *See* Docs. [1] ¶¶ 40–41; [70] at 21–22; [76] at 9. He claims, without evidentiary support, that Skaggs's actions caused Plaintiff to fall in his cell on July 14, 2017, wherein he sustained a head injury. *See* Doc. [70] at 21. These claims are baseless. Skaggs saw Plaintiff regarding his toothache only

once, on June 20, 2017.  By then, Plaintiff had already been seen twice by Nurse Barton for his dental issues; there is no indication in the record that Barton observed any redness, foul odor, drainage, or dental abscess in either appointment.  When Skaggs saw Plaintiff, he told her nothing about his tooth had changed from those earlier appointments.  *See* Doc. [54] ¶ 8.  Her observations appear consistent with those of Nurse Barton three days earlier: she did not note any significant swelling, oral bleeding, or signs of infection, and she did not note any abscess.  She did, however, observe a hole in one of the teeth on the upper-right side of his mouth.

Even assuming the hole in Plaintiff's tooth, coupled with his ongoing pain, presents the sort of objectively serious medical need contemplated by deliberate indifference caselaw, Plaintiff has provided no evidence from which a jury could conclude that Skaggs disregarded his serious medical need.  Plaintiff told Skaggs his pain improved with a salt-water gargle.  Skaggs offered Plaintiff Tylenol and salt, which he declined since he already had both.  Because Skaggs is an LPN, she could neither prescribe antibiotics nor render dental treatment to Plaintiff, so she offered him treatment that Plaintiff explicitly stated was effective in reducing his pain.  It is noteworthy that Plaintiff also saw Skaggs that day for issues related to constipation.  As she did with his toothache, Skaggs recorded Plaintiff's subjective complaints of constipation and performed an objective examination, then offered him medication to treat the issue.[8]  That is further evidence that Skaggs did not intentionally disregard his medical needs at that appointment.  While the provision of medical care alone is not a defense to a deliberate indifference claim, see *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010), the care Skaggs provided was adequate based on the permissible scope of Skaggs's duties as a nurse at PCC.  *See Brodigan v. Swink*, No. 4:18-cv-00273-JAR, 2021 WL 825842, at *6 (E.D. Mo. Mar. 4, 2021).

---

[8] Skaggs administered Plaintiff Docusate and Dulcolax to treat his constipation.

Plaintiff's claim that Skaggs was also deliberately indifferent in failing to schedule him for an appointment with a dentist likewise fails. Skaggs sent Plaintiff's documentation to the dental department along with a request to schedule him with a dentist. Though she could not herself render dental treatment or schedule Plaintiff with the appropriate provider, she sent a request to those who could. That alone defeats Plaintiff's argument. Moreover, Plaintiff saw Dr. McKinney the day after his appointment with Skaggs. Though she could not recall specifically whether she reviewed Plaintiff's appointment schedule on June 20, 2017, Skaggs stated in her declaration that she generally reviewed a patient's upcoming appointments and would "advise the patient to consult with the provider at that appointment."[9] Doc. [53] at 14. On review of Plaintiff's schedule, Skaggs would have seen that Plaintiff had an appointment with a higher-level provider the very next day with whom he could have addressed his toothache.[10] Considering Skaggs also referred Plaintiff to the dental department, Plaintiff has no grounds for arguing she ignored his requests to schedule a follow-up for further treatment of his toothache. Thus, on the undisputed facts in the record, Plaintiff has not demonstrated either that Skaggs's care was inadequate or that she deliberately disregarded Plaintiff's need to see a higher-level provider. *See Reed v. Lear Corp.*, 556 F.3d 674,

---

[9] Even if Skaggs did not tell Plaintiff to discuss his toothache with Dr. McKinney at the June 21, 2017 appointment, that would not rise to the level of deliberate indifference. Plaintiff has provided no evidence that Skaggs intentionally avoided telling him to confer with Dr. McKinney about the toothache, and if Skaggs simply forgot to instruct Plaintiff to do so, such an error does not evince deliberate indifference. *See Fourte*, 746 F.3d at 387 (explaining that deliberate indifference requires "more than even gross negligence"). And, in any event, Dr. McKinney was not Plaintiff's only possible avenue for dental treatment by a higher-level provider; Skaggs's request to the dental department reflects that she indeed pursued further treatment for Plaintiff's issues.

[10] Plaintiff argues that he could not have asked Dr. McKinney for antibiotics to treat his toothache because his June 21, 2017 appointment pertained to an unrelated medical issue. *See* Doc. [70] at 21–22. He asserts that Defendants are "well aware of the fact that Dr. McKinney and the medical staff will only address the medical issues listed on the [health service request] form." Doc. [70] at 22. But he points to no evidence of any such policy; the exhibit he provided in support of his argument is Defendant Griffith, Dr. McKinney, and Nurse Larkin's response to Plaintiff's grievance. *See* Doc. [70] at 30. There is no obvious connection between the grievance response and Dr. McKinney's HSR policies. From the Court's perspective, there is no evidence Skaggs knew Plaintiff would be unable to address his dental issues with Dr. McKinney at the June 21, 2017 appointment.

678 (8th Cir. 2009) ("To overcome a motion for summary judgment, a plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."); *Moore* ex rel. *Moore v. Briggs*, 381 F.3d 771, 774 (8th Cir. 2004) (noting that summary judgment analysis must be based on record evidence, not conclusory allegations of deliberate indifference).  Skaggs is therefore entitled to judgment as a matter of law.

### 2. *Defendant Vossick*

Plaintiff claims that Defendant Vossick ignored the seriousness of Plaintiff's chest pain on September 9, 2017 and did not provide him proper or timely treatment.  That claim fails for many of the same reasons as Plaintiff's claim against Skaggs.  Defendants provided a declaration from Dr. John Williams wherein Dr. Williams detailed the chest-pain protocol at PCC.[11]  *See* Doc. [54-4] ¶ 11.  The protocol involves a series of steps designed to discern whether the patient's issue is truly cardiac in nature so as to "assess the cause of a patient's complaints of chest pain" and because of the potential security risk of transporting inmates to an off-site facility.  *See id.*

The first steps in the protocol, according to Dr. Williams, involve taking the patient's vital signs, including blood pressure, pulse, and blood oxygen levels.  *Id.*  If the patient's blood pressure is elevated, the nurse waits for some period of time (as determined by the patient's clinical presentation) before taking the blood pressure a second time.  *Id.*  If, after that period of time, the blood pressure remains elevated, the nurse should perform an EKG; if the result of that test is abnormal, the protocol requires that the nurse contact a provider for further orders, which might include a troponin test.  *Id.*  The protocol calls for a four-hour waiting period between the initial

---

[11] Of note, Dr. Williams explained that patients who present with symptoms "consistent with a heart attack are not generally immediately transported to the hospital."  Doc. [54-4] ¶ 11.

troponin draw and the second one.  *Id.*  It appears that a positive result from the troponin draws counsels that the patient be transferred to an emergency room.  *See id.* ¶¶ 11–14.

Plaintiff asserted in his deposition that Vossick was "nonchalant" when Plaintiff first presented with chest pain around 5:30 p.m. on September 9, 2017.[12]  *See* Doc. [58-2] at (68:14–21).  But regardless of whether Vossick was "nonchalant" when Plaintiff first arrived, the following facts regarding Vossick's treatment of Plaintiff are undisputed: Vossick initially asked Plaintiff numerous questions related to Plaintiff's family and medical history as well as his current symptoms.  Vossick took Plaintiff's vital signs, which showed that Plaintiff's blood pressure was slightly elevated.  Because he thought Plaintiff may have been experiencing an epigastric (as opposed to cardiac) issue, Vossick gave Plaintiff aspirin and placed Plaintiff in a cell to see whether his symptoms improved with time.[13]  When Vossick again measured Plaintiff's blood pressure around 6:10 p.m., it had lowered.  Because Plaintiff's symptoms did not abate, Vossick performed an EKG on Plaintiff around 7:00 p.m.  Within thirty minutes of the EKG, which was inconclusive,[14] Vossick contacted Dr. Williams regarding the next steps in Plaintiff's treatment.

---

[12] The Court notes that Plaintiff's deposition testimony is directly contradicted by his medical records in several respects; for example, Plaintiff testified that Vossick did not take his vitals when he presented with chest pain, see Doc. [58-2] at (68:16–18), which is an entirely baseless assertion since the medical records reflect that Vossick did, in fact, take Plaintiff's vitals.  Plaintiff cannot create a material dispute by making allegations that are undermined by the evidence in the record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.").

[13] This accords with the protocol, according to Dr. Williams.  *See* Doc. [54-4] ¶ 11 ("If a patient's blood pressure is elevated, the patient's blood pressure should be taken again after a period of time . . . .").

[14] In his deposition, Plaintiff asserted that Vossick told him the EKG machine was "old and outdated" and was not working properly.  *See* Docs. [58-2] at (46:19–47:8); [70] at 5.  Even taking this version of events as true, any faultiness with the EKG machine would not suggest Vossick was deliberately indifferent to Plaintiff's medical needs unless, for example, Vossick knew the machine was not working properly and relied on its results in justifying a decision not to treat Plaintiff's chest pain.  That is, however, not what happened.  Shortly after receiving the EKG results—whether inconclusive, as Vossick asserts, or the product of a defective machine, as Plaintiff suggests—Vossick contacted Dr. John Williams to inform him about Plaintiff's chest pain, symptoms, and the EKG results, and Dr. Williams ordered the troponin draws to determine whether Plaintiff was having a heart attack in addition to ordering a medication.  *See*

Dr. Williams ordered two troponin draws for Plaintiff, to be taken four hours apart, consistent with PCC's chest-pain protocol.  Vossick took the initial troponin draw around 8:15 p.m., and received the negative results around 8:30 p.m.  Vossick told Plaintiff the results were negative and that the second troponin draw would be taken in four hours.  Before the end of his shift around 11:00 p.m., Vossick twice reassured Plaintiff that he would receive the second troponin test and that the results of that test would determine the next steps in Plaintiff's treatment.  Vossick believed that the nurse on the next shift would perform the second troponin draw, and Nurse Larkin did perform that draw around 12:30 a.m. on September 10, 2017, about four hours after Vossick performed the initial draw.  The second draw was positive, and Plaintiff was transferred to the emergency room for treatment, where tests suggested he suffered an acute myocardial infarction.  And, finally, after another transfer, Plaintiff received a cardiac catheterization without complication.  Based on Dr. Williams's declaration, it appears that Vossick's undisputed actions follow the chest-pain protocol at PCC; on this basis alone, it can hardly be said that Vossick intentionally mistreated or "refuse[ed] to provide essential care" to Plaintiff.  *See Dulany*, 132 F.3d at 1241.

Plaintiff takes issue with the amount of time Vossick took to assess his chest pain, arguing that the delay in Vossick's treatment reflected deliberate indifference to his serious medical needs.  There are numerous issues with that argument.  First, where a plaintiff claims deliberate indifference based on a delay in treatment, the "objective seriousness of the deprivation" can be measured by the effect the delay had on the plaintiff's condition.  *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016).  But Dr. Williams stated in his declaration that Plaintiff's medical records do not indicate that any purported delay in treatment had a negative effect on the course

---

Doc. [54-3] ¶ 7.  It is therefore not material to Plaintiff's deliberate indifference claim whether the EKG machine was faulty, because Vossick promptly sought direction as to Plaintiff's treatment from the on-call doctor at PCC after the EKG.

of Plaintiff's treatment or prognosis, and Plaintiff has provided no evidence suggesting that the delay caused him harm.  *See Riebold*, 815 F.3d at 1119 ("To establish [the effect of delay], the inmate 'must place verifying medical evidence in the record . . . .'" (quoting *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005))); *see also Buchanan v. Kapur*, No. 2:15-cv-5-CDP, 2017 WL 3978377, at *8 (E.D. Mo. Sept. 11, 2017) (holding that failure to provide verifying medical evidence of adverse effect of delayed treatment for chest pain defeated the objective prong of deliberate indifference); *Farver*, 931 F.3d at 811.  In fact, Dr. Williams stated in his declaration that Vossick "appropriately addressed the patient's complaints of chest pain on September 9, 2017."  Doc. [54-5] ¶ 18; *see also Brodigan*, 2021 WL 825842, at *5 ("The Eighth Circuit has advised that '[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment.'" (quoting *Dulany*, 132 F.3d at 1242) (alterations in original)); *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007).  Again, Plaintiff has provided no evidence to dispute that assertion.

Second, even if Plaintiff had introduced evidence showing negative effects from Vossick's alleged delay in treating his chest pain, he still has not shown that Vossick had the requisite mens rea to sustain a claim of deliberate indifference.  *See Brodigan*, 2021 WL 825842, at *4 (observing that a deliberate-indifference plaintiff "must demonstrate that the defendant deliberately disregarded the [plaintiff's] need, acting with a 'sufficiently culpable state of mind'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994))).  Vossick did not have the ability to dictate the course of a patient's treatment and could not order the transfer of a patient to an outside provider absent "extraordinary circumstances."  Doc. [54] ¶ 5.  Based on the evidence in the record, Vossick appears to have properly followed the chest-pain protocol.  Even if Plaintiff disagrees with the

21

protocol, Vossick had no control over its formulation, and mere disagreement with that approach to treatment is insufficient to create liability under the Eighth Amendment. *Dulany*, 132 F.3d at 1239 (noting that "inmates have no constitutional right to receive a particular or requested course of treatment"). To the extent there was any delay in Vossick's execution of the protocol, such as the fifty-minute gap between the second blood-pressure test and the EKG or the forty-five-minute period between the call with Dr. Williams and the first troponin draw, such a delay could conceivably reflect negligence by Vossick,[15] but there is no evidence supporting the assertion that Vossick intentionally delayed his treatment of Plaintiff. *See Jackson*, 756 F.3d at 1065; *Fourte*, 746 F.3d at 387.

In sum, the undisputed facts show that Vossick was not deliberately indifferent to Plaintiff's chest pain, and for that reason the Court must grant Vossick judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### 3. Defendant Griffith

Finally, Plaintiff alleges Defendant Griffith was deliberately indifferent because she was aware of Plaintiff's serious dental issues but failed to take the appropriate steps to address those issues, including by refusing to send Plaintiff for outside treatment of his toothache when she knew there was no dentist at PCC. *See* Docs. [1] ¶ 55; [70] at 9–10. Griffith argues that she was not deliberately indifferent to Plaintiff's serious medical needs and that the Court should therefore grant her qualified immunity.

---

[15] As Plaintiff has not made any claims of negligence, the Court does not express an opinion as to the viability of any such claim. The Court also acknowledges that Plaintiff points to an email exchange between Anita Clarke, an employee of the Department of Corrections, and Nurse Larkin as support for his claim that Vossick's treatment ahead of the first troponin draw was delayed. *See* Doc. [76] at 5, 7, 15–16. This does not change the fact that Plaintiff both (1) failed to present verifying medical evidence showing an adverse effect of any delay, and (2) failed to show that the delay was a result of anything resembling deliberate indifference. *See Jackson v. Buckman*, 756 F.3d 1060, 1065–66 (8th Cir. 2014) ("Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference.").

An official sued in his or her individual capacity under § 1983 "is entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Capps v. Olson*, 780 F.3d 879, 884 (8th Cir. 2015) (citing *Pearson v. Callahan*, *555* U.S. 223, 232 (2009)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (quoting *Pearson*, 555 U.S. at 236). Because an official is entitled to qualified immunity unless both prongs are satisfied, the analysis ends if either is not met. *See id.*

In evaluating Plaintiff's claim against Griffith, the Court finds persuasive a recent decision from the Court of Appeals for the Tenth Circuit that involved facts similar to those here. *See Bird v. Lampert*, No. 20-8009, 2020 WL 7351801 (10th Cir. Dec. 15, 2020). In that case, the plaintiff-inmate at the Wyoming State Penitentiary, Bird, submitted a health service quest (HSR) for a "bad tooth" on January 13, 2017. *Id.* at *1. Like PCC, the Wyoming Department of Corrections contracted with Corizon, Inc. to provide medical and dental services to inmates. *Id.*; *see also* Doc. [58-1] ¶ 3. A Corizon dental assistant working at WSP submitted a scheduling order for Bird to be seen February 16, 2017 by Dr. Tippets, and the dental assistant explained to Bird that it would take longer for him to be seen because WSP did not have a full-time dentist at the facility. *Bird*, 2020 WL 7351801, at *1. On February 5, 2017, Bird submitted a second HSR, stating that his toothache was "[s]tarting to be real painful" and that he thought the tooth needed to be pulled. *Id.* (alteration in original). The dental assistant reiterated to Bird that he was already on the dental list and apologized for the long wait. *Id.*

For whatever reason, the February 16 appointment did not occur. *Id.* On February 22, the

dental assistant, without informing Bird, again scheduled Bird for an appointment with Dr. Tippets. *Id.* Bird submitted a complaint form on February 23 urging that he had been denied dental care for his painful toothache. *Id.* The dental assistant examined Bird on February 24, which appears to be the first time he was seen for his toothache. *See id.* She noted no redness, swelling, or drainage around Bird's tooth and told Bird he was scheduled "to be seen in dental as soon as [the] Dental Provider returns in March." *Id.* (alteration in original). Bird submitted a grievance on February 28 regarding his lack of dental care, which the WSP grievance manager denied; Bird filed an appeal of the denial. *Id.* at \*2. On March 14, Bird finally saw Dr. Tippets, who extracted Bird's abscessed tooth in an uncomplicated procedure. *Id.* Sometime after, the defendant-warden of WSP and the WDOC prison director denied Bird's grievance appeal on the grounds that Dr. Tippets had resolved his dental issues. *Id.* Bird then filed an action pursuant to 42 U.S.C. § 1983 alleging that his delay in seeing a dentist caused him several issues. *Id.* He claimed, among other things, that the warden was deliberately indifferent to his medical needs for "fail[ing] and/or refus[ing] to provide . . . 'off-site' dental appointments." *Id.*

In concluding that Bird had not shown deliberate indifference by the warden (and that the district court therefore properly granted the warden qualified immunity), the Tenth Circuit first observed that Bird's claim was "fundamental[ly] defect[ive]" because it was not clear how the warden was personally involved in the allegedly delayed dental care to Bird. *Id.* at \*3. The court specifically noted that the warden had considered Bird's grievance appeals only *after* Dr. Tippets had resolved the dental issues. *Id.* Moreover, the court found that Bird had failed to provide any evidence establishing the subjective prong of deliberate indifference: that the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at \*4; *see also Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016). Because there was no evidence that the warden was aware there

was a delay in Bird's dental care, nor that the warden knew any such delay posed a "substantial risk of serious harm," the court held that Bird failed to show the warden had the required culpable state of mind. *Bird*, 2020 WL 7351801, at *4.

As in *Bird*, Plaintiff has failed to demonstrate that Griffith had any personal involvement in his allegedly tardy dental care, without which she cannot be liable in this case. *See Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016); *see also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995))). He similarly has identified no evidence suggesting that Griffith "knew of but deliberately disregarded his serious medical need." *Saylor*, 812 F.3d at 644 (quoting *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991)). These deficiencies are fatal to his claim. Seeking to establish that Griffith "was fully aware of Plaintiff's severe dental problems," Plaintiff first points to a letter sent to him from Griffith dated August 3, 2017. Doc. [70] at 9, 27. The letter was in response to correspondence from Plaintiff dated August 1, 2017, which was after Plaintiff had already seen a dentist and had his tooth extracted. Griffith made no mention of awareness of Plaintiff's toothache or the alleged delay in its treatment. In fact, rather than displaying a "refusal to provide . . . care," *Dulany*, 132 F.3d at 1241, Griffith did quite the opposite: she noted Plaintiff's desire to be removed from administrative segregation, his mental health issues, and his issues with headaches, and copied three separate officials on her response to address those concerns. *See* Doc. [70] at 27. This hardly suggests Griffith acted with the "obduracy and wantonness" required for liability due to delay. *See Winfrey v. Babich*, 1:07-cv-159-SNLJ, 2010 WL 559671, at *3 (E.D. Mo. Feb. 10, 2010) (quoting *Whitley v. Albers*, 47 U.S. 312, 319 (1986)). Plaintiff next claims his IRR informed Griffith about the "nature of Plaintiff's toothaches/abscess and . . . the inadequacy

25

of" his treatment at PCC. *See* Doc. [70] at 10. But Plaintiff submitted the IRR on July 21, 2017, after he had already seen the dentist, and the director of nursing, not Griffith, responded to it. *See* Doc. [58-3] at 12, 16.

Based on the evidence before the Court, the only time Griffith was even arguably involved in the treatment of Plaintiff's toothache was when she, along with Dr. McKinney and Nurse Larkin, denied Plaintiff's grievance.[16] Plaintiff filed the grievance August 17, 2017, and it was not received until September 6, 2017. *See* Doc. [70] at 30. Both of those dates came after Plaintiff had already seen a dentist, had his tooth extracted, and told PCC medical personnel that his dental issues had been resolved. Notwithstanding Plaintiff's claims to the contrary, the grievance response cannot possibly suggest that Griffith intentionally disregarded or delayed Plaintiff's desire to see a dentist, since he had already seen a dentist prior to submitting the grievance. *See DuBois v. Dooley*, 277 F. App'x 651, 652 (8th Cir. 2008) (affirming grant of summary judgment where warden "undisputedly lacked medical training, and his only involvement was to respond to [the inmate-plaintiff's] administrative remedy request").

The evidence Plaintiff cites in asserting Griffith was deliberately indifferent in no way supports his contention that she knew of his toothache and its severity, or that there was a delay in treatment over which she had any control.[17] Without awareness of the alleged severity of

---

[16] In his deposition, Plaintiff asserted that he sent Griffith numerous letters regarding his toothache. *See* Doc. [58-2] at (11:24–12:21). But those letters are not in the record before the Court, so the Court cannot determine whether they made Griffith aware of the nature of Plaintiff's dental issues. And in any case, the fact Plaintiff sent such letters does not demonstrate that Griffith intentionally delayed his access to dental care when he has provided no evidence in support of that assertion and she had no control over the medical staff at PCC.

[17] Plaintiff submitted a declaration from two fellow inmates at PCC who stated that they were twice permitted to see a dentist outside PCC in June 2017. Doc. [70] at 29. The declaration does not suggest any connection between Griffith and the dental treatment of either inmate, nor does it make up for the lack of evidence Plaintiff submitted supporting his argument that Griffith was aware of *his* dental needs and was deliberately indifferent to those needs. The only reference to Griffith in the declaration is that "the Warden gave transportation the approval to transport" the inmates for their off-site dental appointments. *Id.* This might be relevant if, for instance, Plaintiff introduced evidence that Griffith would not grant permission for his transport to an off-site dentist. *See Estelle*, 429 U.S. 97, at 104–05

26

Plaintiff's toothache, Griffith could not have denied, delayed, or intentionally interfered with his medical treatment within the meaning of the deliberate indifference standard.  *See DuBois*, 277 F. App'x at 652; *Saylor*, 812 F.3d at 644.  Plaintiff has therefore failed to establish that Griffith violated his constitutional rights under the Eighth Amendment.  Having found no constitutional violation, the Court need not proceed to the second prong of the qualified immunity analysis. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003) ("Without the requisite showing of a constitutional violation, summary judgment is proper because [plaintiff] has failed to establish the existence of an essential element of [his] case.").  Griffith is entitled to summary judgment as to Plaintiff's deliberate indifference claim on the basis of qualified immunity.

CONCLUSION

For the reasons discussed above, the undisputed facts require the Court to grant summary judgment to each of the three Defendants on Plaintiff's claims of deliberate indifference.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion Requesting Appointment of Expert Witnesses, Doc. [32], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Appointment of Counsel, Doc. [82], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Unauthorized Surreply in Opposition to Defendants' Motion for Summary Judgment, Doc. [77], is **DENIED**, and Plaintiff's Motion to Deny Defendants' Motion to Strike Plaintiff's Supplemental Motion, Doc. [78], is **GRANTED** to the extent Plaintiff requests that the Court deny Defendants' Motion to Strike.  All other relief sought in that Motion is **DENIED**.

---

(concluding that deliberate indifference can include intentional interference with treatment).  He did not, however, present any such evidence.

      **IT IS FURTHER ORDERED** that Defendants Stephen Vossick and Sarah Skaggs's Motion for Summary Judgment, Doc. [52], is **GRANTED**.

      **IT IS FINALLY ORDERED** that Defendant Griffith's Motion for Summary Judgment, Doc. [56], is **GRANTED**.

      An appropriate Judgment will accompany this Memorandum and Order.

Dated this 29th day of March, 2021.

_____

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE